MARY E. RYLE, appellant,

*v.*

JOHN RYLE, respondent.

The defendant's testator was a creditor of a corporation the stock of which was owned by the complainant; thereupon the complainant assigned to the testator a majority of the stock, upon an understanding that the latter should manage the affairs of the company until its financial condition was improved, holding the stock for the benefit of the complainant. While in possession of the stock, the testator informed the complainant that unless the latter would execute to him an absolute assignment of the stock, he would withdraw from the arrangement and besides would make such representations as would injure the complainant in his business. By these means the complainant was induced to execute the assignment.--*Held*, that the complainant was at liberty to rescind the assignment on equitable terms.

On appeal from a decree advised by Vice-Chancellor Bird,. whose conclusions follow :

The bill alleges that an act entitled " An act to incorporate the· Passaic Water Company" was approved February 13th, 1849, and that under such act a company was organized for supplying· the city of Paterson with water; that at first the capital stock was $100,000, divided into shares of $25 each, and that by an· act approved April 7th, 1868, the company was authorized to· increase its capital stock to $500,000 ; and that it did increase its capital stock ; and that the amount on the 10th day of January, 1877, was about seventeen thousand shares; that on that day John Ryle, the complainant, was the actual owner of all the said. stock of said company, although a few shares were nominally held by other persons, and that he was then, and for many years before had been, president, and was in complete and exclusive control of all its business, his sons and personal friends being directors and officers ; that said company had the exclusive monopoly of supplying said city with water ; that said city was growing in population very rapidly, and that the revenues of said company had greatly increased, thereby largely increasing the value of the·

franchise; that in 1875 the bonded indebtedness of said company, secured by mortgage on all its property and franchises, amounted to $670,500; and that thereafter in said year the complainant, being indebted to various parties in about $225,000, conveyed unproductive real estate to said company and received in part payment $225,000 in bonds of the company, at seven per cent., secured by mortgage on all its property, and also received capital stock of said company to the amount of $225,000, and immediately transferred said bonds to his creditors; that in 1876 John Ryle was a member of the firm of John Ryle & Sons, and that at the end of that year that firm was insolvent; that during that year the firm borrowed the notes of said water company to the amount of about $80,000 and had endorsed them and delivered them to the creditors of the firm, which notes were given by the company without any consideration and solely to accommodate said firm; that on the 10th of January, 1877, the interest on the said $225,000 of bonds issued in 1875 remained unpaid, and that the said notes of $80,000 were unpaid, and that thereby the affairs of the company were embarrassed and in need of care, although its property and franchises were of great value and its future success secure; that at that time, by prudent management, the said company would be able, from its large and increasing revenues, to take care of all the said last-mentioned obligations and finally to pay them.

The bill then alleges that in January, 1877, and for a long time prior thereto, the greater part of the capital stock of said company owned by John Ryle had been pledged to secure debts due from him and from said firm, and that at that time John Ryle held in his possession only six thousand seven hundred and six shares; that at that time William Ryle, a nephew of John Ryle and a man of large wealth, owned about $16,000 worth of notes of said company endorsed by said firm; that William Ryle also held about $20,000 of said bonds of the $225,000 issue of 1875; that John Ryle then owed a large amount of money to the estate of William Ryle, deceased, who was the father of William Ryle aforesaid, who was interested largely therein, and who desired to preserve the solvency of John Ryle, and desired to

secure the control of said company and to recognize and pay or provide for the payment of the said $80,000 of notes and adjust the $225,000 of bonds on such basis as would enable the company to pay the same; that about the 10th day of January, 1877, the said William Ryle came to John Ryle and urged that as the said John Ryle was getting on in years, and would be likely to lose the stock of said company, and that William Ryle desired to save it for John Ryle, and to take charge of said company to save it, and then proposed that John Ryle should turn over and deliver to him, William Ryle, all the capital stock of said company, so as to put the said William Ryle in full control of said company, he promising John Ryle to save said stock for his benefit; that because of such professions John Ryle agreed to give over the said company into the hands and control of said William Ryle; that no arrangement was made or suggested for any assignment or other writing, to show the nature of the transfer, nor was the amount to be transferred calculated or referred to, the understanding being that John Ryle should give over all its stock; that on the day after making said arrangement John Ryle took all the certificates of said company which he then had possession of, being six thousand seven hundred and six shares, and delivered them to William Ryle, and that William Ryle afterwards, on the 15th of January, 1877, surrendered said shares to the company and took from it new certificates for a like amount, in his own name, thereby becoming the apparent owner on its books of that amount; that said stock was transferred by John Ryle to William Ryle for no consideration or purpose except as aforesaid, and that John Ryle trusted implicitly to the said William Ryle, and took no receipt; that at that time about four thousand more shares of said stock belonging to John Ryle were pledged to a creditor of John Ryle; that it was expressly understood and agreed, before and at the time of the transfer of the said six thousand seven hundred and six shares, that said stock was in nowise to become the property of William Ryle, but should remain the property of John Ryle, but that William Ryle was to be clothed with apparent ownership, so as to control the company; that at the time of the said transfer of the six thousand seven hundred and

six shares and the said four thousand shares, the said stock was worth about twenty-five per cent. of its par value, in all about $65,000. The bill then alleges that on February 1st, 1877, William Ryle sent an agent to John Ryle with a written agreement prepared for John Ryle's signature, and that the agent informed John Ryle that William Ryle could not or would not proceed successfully in managing the affairs of said company unless John Ryle signed the agreement, and that John Ryle, supposing it was intended merely to make William Ryle the apparent absolute owner, and to give him unquestioned control of the company, and feeling that he was already in possession of six thousand seven hundred and six shares, and he was already in the power of William Ryle, signed, acknowledged and delivered the said agreement; that he would not have signed it if he had not had perfect confidence in William Ryle, and that he did it for the purpose of giving William Ryle full control of said stock for the purpose before mentioned; that immediately after the delivery of the said six thousand seven hundred and six shares to William Ryle, he assumed control of said company, organized a new board, interested many of the parties who held the notes endorsed by said firm, and induced them to accept bonds of said company at four per cent. in payment of said notes, and then funded $80,000 worth of notes in the bonds of the company, and made a negotiation with the holders of the $225,000 bonds to extend the time for payment at the reduced rate of four per cent., the past due interest being funded in four per cent. bonds; that after the execution of said agreement John Ryle, under the direction of William Ryle, procured the release of said four thousand shares of pledged stock and caused it to be delivered to William Ryle, who, on the 9th of June following, had it, except one hundred shares, transferred to himself on the books of the company.

The bill then alleges that the recitals in the said written agreement, so far as they conflict with the statements of the bill, are wholly untrue.

It is alleged that the work of funding and settling the said debts of $80,000 and $225,000, and the interest thereon, was fully accomplished by June 1st, 1883, so that the affairs of the

company were fully restored to a satisfactory condition, and its solvency secured, and its success made reasonably certain, and the purposes of the transfer to William Ryle for the most part, if not wholly, accomplished; but that before said funding and settling had been fully accomplished, William Ryle became feeble in body and mind and so continued, getting worse, part of the time in this country and part in England, until November 1st, 1881, when he died; that William Ryle left a will in and by which he gave all his personal property, including said stock, to his widow, Mary E. Ryle, the defendant, who claims to hold the same absolutely as her own property; that the said Mary E. Ryle relies on the said agreement, but as to her it is null and void; that it was signed by John Ryle when William Ryle maintained to him a most confidential fiduciary relation in respect to that stock and that her claim is fraudulent, inequitable and unconscionable.

The bill prays that the said agreement may be rendered null and void and may be surrendered to be canceled, and that said stock may be decreed to belong to John Ryle, and that the said Mary E. Ryle holds it in trust for John Ryle's benefit.

Mrs. Ryle answers the bill, from which answer it is apparent that the real point in dispute is whether the written agreement expressed the true or real understanding of the parties with respect to the transfer of said stock, or not. The answer insists that the written agreement faithfully expresses the intent and meaning of the parties in this language:

"And this defendant, in further answering, says that the said six thousand seven hundred and six shares of stock were transferred to said William Ryle by John Ryle, the complainant, for the consideration and under the circumstances following, to wit: the stock of said company had become worthless, and the said company had neither money nor credit with which to continue its business, and thereupon the said John Ryle agreed to transfer to William Ryle aforesaid, ten thousand seven hundred and six shares of his stock in said company upon the consideration that the said William Ryle should undertake to manage said company, and by applying thereto his credit and financiering skill, give all the aid he could to the renewal of the company's credit, and the continuance of its business, whereby the remaining stock of the said John Ryle which, with all the rest, was worthless at the time of said agreement, might become of value."

The answer insists that John Ryle executed said agreement with full knowledge of its effect and in conformity with his previous agreement, intending to make the said William Ryle the absolute owner of the stock without any trust or limitation whatever, and admits that, after the delivery of the said six thousand seven hundred and six shares to William Ryle, he assumed control of the affairs of said company and managed the same substantially as set out in the bill.

The relation of the parties to each other will be ascertained, and much light thrown upon the transaction, by grouping the facts together in an orderly manner. John Ryle was the uncle of William Ryle, and came to New Jersey from England in 1839 or 1840 when he was about twenty-three years old. In 1853 or 1854, he brought William Ryle to this country; William Ryle's father intrusted him to the care of John Ryle, and he lived with John Ryle until he was married; they both resided in Paterson until the death of William Ryle; he died at about the age of forty-eight. William Ryle was a merchant in the city of New York, engaged in the importation of silk, and amassed a large fortune. Nothing appears in the testimony to show that the early and intimate relations were in anywise interrupted.

On November 1st, 1876, a large amount of interest was coming due upon the obligations of the water company, and because John Ryle had no means to pay the same he was very much troubled, and looked to his nephew, William Ryle, for aid. Joseph Wright, a brother-in-law of William Ryle, residing in England, happened to be in this country just previous to the time when said interest would mature. He was produced as a witness in this cause by the defendant. His testimony was frank and straightforward. He was present at an interview between John Ryle and William Ryle. It took place in Philadelphia. I think William Ryle had gone to Philadelphia, and that John Ryle followed him there, William Ryle having proceeded that far on his way to Chicago with Mr. Wright. Without quoting, I will give the language of the witness as nearly as possible, detailing what took place between the uncle and nephew upon this occasion:

"There was a long discussion that evening, William Ryle hesitating very much to offer help; I was desirous that he should assist his uncle if possible, and I think I ultimately prevailed upon him, upon the understanding that he should have entire control of the company, John Ryle promising to pay over everything to him and to hand over all the securities and everything of that kind on condition that he, William Ryle, would meet its interest or provide for its interest; this interview lasted from ten in the evening until three the next morning, when John Ryle returned to New York, to which place he was followed the next day by William Ryle, who went there to provide for the interest which was about falling due; John Ryle proposed to William Ryle, in that interview, to give him absolute control of all the property of every description, if he would become interested in the water-works and manage them; in which interview it was said that if William Ryle would do it the stockholders would have confidence in the water company, and it would bring capitalists around, and bring the water-works into a state of prosperity."

The witness added that from what he knew of William Ryle, he would not have undertaken it unless he had had absolute control.

Here it should be noted that Mr. Wright, who is produced by the defendant, makes it clear that John Ryle was laboring under great financial distress; that he had no means of his own with which he could raise the necessary funds to meet and pay the accruing interest; that he looked to his nephew, William Ryle, and followed him to Philadelphia, to arrange with him accordingly; that William Ryle was finally prevailed upon to render the required aid, but that he would only do so upon the promise of John Ryle to transfer to him the absolute control of all his stock and securities of every kind in the company, and that this was the whole transaction without any other consideration or condition. I remark that as I understand the case, nothing else essential to its proper settlement anywhere appears, but all the transactions of the parties subsequent thereto are in conformity to these statements of Mr. Wright.

I will proceed with the facts. William Ryle paid the interest, which came due about November 1st. So far as the testimony shows, nothing took place between the parties until the evening of the 9th or 10th of January, 1877, when, according to the testimony of one of John Ryle's sons, William Ryle came to the

office of John Ryle, from which they both went together; after which, on the very next morning, John Ryle called upon his son and asked him for the shares of stock of which he had possession, and which he then gave to his father, who immediately handed them to William Ryle. The number of shares thus handed over were six thousand seven hundred and six. William Ryle held these certificates of stock until the 15th of the same month, when he had them transferred on the books of the company to himself. It is claimed, and not denied, that William Ryle immediately entered upon the management and control of said company. I believe there is nothing else which shows that the parties were brought together with respect to this transaction, until the 31st of January, 1877.

Note again, William Ryle's confidence in John Ryle. William Ryle had advanced money (about $15,000) and paid the interest upon these securities, which the defendant alleges were worthless, about the 1st of November, 1876, upon the promise of John Ryle that he would turn over to him all of said securities and all the assets of the company, but at that time requiring nothing more than his promise, trusting him from the 1st of November until the 10th or 11th of January then next, before he asked him to hand over any of the stock; and that he required nothing more until the 31st day of January, when the agreement in writing was prepared and sent to John Ryle for his signature.

Again, as to the facts. We have advanced now to the 31st of January, 1877, when the agreement was offered. Was that agreement, so expressed in writing, substantially variant from the original parol agreement which has been detailed by Mr. Wright? It recites that John Ryle was the owner of a large amount of the stock of said company, and that by reason of the past management and other causes the said stock had become of no market value, and could not be disposed of so as to realize much if anything therefor, and that John Ryle was convinced that by means of a new management the value of said stock would be largely increased, and that John Ryle had offered to William Ryle to transfer to him ten thousand seven hundred

and six shares of said stock, if the said William Ryle himself and those whom he might associate with him, would assume the management of said company, the said John Ryle believing thereby that the remainder of the stock of said company, owned by the said John Ryle, would be so increased in value as to produce to him a great deal more than all the stock in said company then owned by him, the said John Ryle, including said ten thousand seven hundred and six shares; and that in consideration of the said ten thousand seven hundred and six shares, the said William Ryle agreed, for himself and those he should associate with him for that purpose, to assume the management and control of the business affairs of said company; and that the said John Ryle had already transferred upon the books of said company the said six thousand seven hundred and six shares, and that at that time was unable to transfer upon the books of the company the remaining four thousand shares, by reason of their being lodged as collateral security for the obligation of the said John Ryle. In consideration of which premises, and of $1, the said John Ryle sold, assigned, transferred, and set over unto the said William Ryle, the said six thousand seven hundred and six shares, then already transferred, " to have and to hold the same, unto the said party of the second part, his executors, administrators and assigns, to his and their own proper use, benefit, and behoof, absolutely and forever." The agreement contains a similar clause, with respect to the said four thousand shares of stock which were at that time pledged.

Note again, that the agreement says, in its recital, that John Ryle was convinced that by means of a new management the remainder of the stock owned by him would be so increased in value as to produce to him a great deal more than all the stock in said company then owned by the said John Ryle, including the ten thousand seven hundred and six shares, and that in consideration of ten thousand seven hundred and six shares, the said William Ryle agreed, for himself and those he should associate with him for that purpose, to assume the management &c.; whereas the agreement, as stated by Mr. Wright, makes no allu-

sion whatever to the increased value of the remainder of the
stock as distinguished from the rest, or as being so increased under
the new management as to be worth more than the entire
amount of stock at that time, nor does it make any allusion to a
special trust and confidence in anybody else than William Ryle.
It will be noted that, as this agreement stands, whilst it is so
drawn as to place the legal title to the stock in William Ryle,
he was assuming to contract, not only for himself, but for those
he should associate with him for the purpose of the management
of the company.

Let us proceed with the facts. We have the agreement before
us. We are trying to understand whether or not it expresses
the real meaning and intention of the parties, and whether that
meaning and intention were, as the complainant now insists, a
qualified transfer, a transfer for his own protection, or, as the
defendant insists, an absolute and unqualified sale and transfer,
as the terms of the writing import. I believe there is no proof
that John Ryle was consulted respecting this written agreement.
The inference would be most strongly that he was not. John C.
Ryle, a nephew of the complainant, and a first cousin of William
Ryle, and intimately acquainted with him in his lifetime, was
produced as a witness by John Ryle. He said that William
Ryle brought this paper to his house, and requested him to take
it to John Ryle for him to sign; he said William Ryle told him
he wanted it signed, in order to give him a legal claim to certain
stocks of the Passaic Water Company which John Ryle had
given him; he said that from the position he was taking, or was
about to take, in the affairs of the said company, he should have
to appear before the public as the principal owner of its stock,
and that he wasn't going to stand in that position without being
legally entitled to occupy it; he said that it must be signed, and
that if John Ryle would not sign it that he, William Ryle,
would withdraw from the Passaic Water Company all his aid
and countenance; he said that if John Ryle would not sign that
document that he, William Ryle, would make such a representa-
tion to Leisler & Somerhoff as would interfere with the negotia-

tions pending between that firm and John Ryle, with a view to business, and told the witness that he could make use of that remark to John Ryle if necessary. The witness says he made use of it, repeating to John Ryle what William Ryle had said. Note again, that this messenger was commissioned, not only to carry a message, but a threat, which threat was calculated to act powerfully upon the mind of John Ryle. Being financially insolvent, and having surrendered all the stock which he then had control of, retreat was impossible, and a refusal to comply with the demands of William Ryle would rob him of the little hope of aid which remained to him amongst his business friends in New York. William Ryle insisted that the agreement should be signed that he might have a legal claim to certain stock which John Ryle had given him, and that he might appear before the public as being legally entitled to it. He did not insist that the agreement should be signed because John Ryle had ever promised to sign any agreement, or that the agreement which the witness carried was an expression of the agreement which the parties had entered into. He did not insist that he had purchased the stock, or that it had been sold to him, or that John Ryle had promised to sell or assign it to him absolutely, but that for certain other reasons he wanted the legal title in himself.

It is uncertain when these parties again met or had any interview or correspondence respecting this stock, but John C. Ryle, in speaking of the letter next referred to, says that it was prepared some days after the agreement was signed. That letter was one which seems to have been very carefully prepared by William Ryle. It seems that he first dictated it to John C. Ryle, who wrote it in a memorandum book, from which he copied it, and then carried the copy to John Ryle, who made a duplicate, which he signed. This letter was addressed to Leisler & Somerhoff, New York merchants, who held four thousand shares of the stock as collateral security for the payment of an indebtedness of the firm of John Ryle & Sons. Amongst other things, William Ryle has John Ryle say in this letter:

"Now, as you have ample securities in the properties of John Ryle & Sons for advances thus far made, and cannot have attached a value to the stock of the water company in making such advances, it is my desire that you surrender, or instruct Messrs. A. L. & Co. to do so, the certificates representing my four thousand shares of Passaic Water Company's stock, to William Ryle, whom I have authorized to call upon you in reference thereto, and who will be prepared to explain to you more in detail the reasons for this action. My duties to the younger branches of my family require that I should not pledge all my property for the advantage of the senior brothers. Moreover, I feel assured that the carrying out of Mr. William Ryle's plans respecting the Passaic Water Company, and the transfer to him of the four thousand shares in question, will increase my responsibility as a member of the firm of John Ryle & Sons far more to the advantage of all concerned than in maintaining the present position of the stock. This being my private property, you need only my personal assent to this transfer, and as such please consider this present writing."

Here, again, it will be noted that although William Ryle prepared this letter some time after the execution of the agreement in which there is a transfer of this stock to him " absolutely and forever," he makes no mention of that fact; he nowhere has said, " having sold, assigned, transferred, and set over unto the said William Ryle all my right, title and interest in the said stock "— or any like expression—" I desire you to surrender the said stock to him."

. Not until July 5th, 1880, does there appear anything that took place between these parties in which this stock was unmistakably mentioned. On that date William Ryle wrote to John Ryle, reminding him of his indebtedness to the estate of William Ryle's father, and saying that he should " deeply regret if after so many indulgences have been granted to you, the inevitable should have to be resorted to," to which John Ryle replied on the 10th of July, 1880, saying, amongst other things:

"If I could obtain the real value of the ten thousand seven hundred and six shares of the capital stock of the Passaic Water Company you hold in trust for me, from any one, I could pay the mortgage off. What amount do you think I could obtain from you or any one else for them?"

This William Ryle replied to on July 14th, saying:

"Yours dated 10th (postmarked 12th) is at hand. I hasten to correct an erroneous expression in the first portion of your letter; will reply to the

second portion this evening. I do not, to my knowledge, hold a single share of the capital stock of the Passaic Water Company *in trust,* for you or any other person."

So much for the interviews, agreements and correspondence which took place between these parties directly. But it appears that William Ryle did at once take control of the water company and had a board of directors of his own choice. This, I believe, is not disputed. John Ryle was continued as president. Special mention has been made of a meeting of the stockholders in June, 1880. William Ryle was at that meeting. It seems that a quorum was not present, and that John Ryle was sent for to complete the quorum. He did not attend. From the statements of witnesses I infer that John Ryle's refusal to be present displeased William Ryle, and led him to make some observations which, it is claimed, shows that he did not hold this stock so absolutely as the written agreement would imply. Reuben Ryle, a son of John Ryle, says that he was present at that meeting, and sent for his father to attend *it,* and that when he did not, William Ryle spoke " about the usage he had been put to because my father had not come up there after what he had done to save the company for his benefit." John C. Ryle was present at the meeting also. He details what William Ryle said. His language is:

" He appealed to the gentlemen present to bear witness how badly he (William Ryle) was being used, inasmuch as John Ryle had not come to the meeting, and he said it was outrageous that such treatment should be done to him (William Ryle), who was sacrificing his time and giving his energies to the advancement of the company; and he furthermore stated that it was not at all for his interests, but that it was solely for the interests of John Ryle."

John Ryle then was and had always been a director. Peter Ryle, a son of John Ryle, was sworn. He was one of the directors of the company. He was present at the June meeting now referred to. He said :

" I had gone down to the Murray Mill to ask father to go up to that meeting at the water company's office, and father would not come; he refused to come, and I came back to the water-works office and so reported to the late William Ryle; the late William Ryle then arose from his chair and stood

Ryle *v.* Ryle.

at the head of the table and talked pretty hard about father; he said that he had been doing so much for him, that he felt that it was outrageous; that father had very little appreciation of the kindness that had been shown him, and that it was not right for him to disregard him and their efforts and their time, and to refuse to come to the office and make a quorum so that they might have their meeting; he then referred to Mr. John Shaw, who was there, and said : ' Here is Mr. Shaw and myself come down here to this office week after week, and have not a penny's worth of interest in it; we are doing this for him, and he won't as much as show us the ordinary courtesy to come to the office.' "

This testimony stands uncontradicted. There is some evidence showing that in the years 1876 and 1877 the stock in question was very much reduced in value.

In this important controversy what is the great point of inquiry ? I think it is the ascertainment of the terms of the agreement made between these parties in Philadelphia, in October, 1876. It is said by the defendant that the writing is to settle the terms of the agreement. I think not necessarily. The writing was not made at the time, nor soon afterwards. The writing was not made until the agreement made in Philadelphia had been executed, according to its terms, as fully as the circumstances would allow. William Ryle had advanced the money and paid the interest which fell due November 1st, 1876. He entered upon the management of the company. All the shares (six thousand seven hundred and six) of stock which John Ryle then had the control of were assigned to William Ryle, and he transferred them to himself on the books of the company. The only agreement that was ever made (except the one sworn to by the complainant, John Ryle, which I will refer to hereafter) was made in Philadelphia. There the parties met face to face. There propositions were made and accepted. For that agreement there was a consideration. The writing did not express the agreement made in Philadelphia as detailed by Mr. Wright, and there is no proof that it rests upon any other consideration whatever. The consideration of the agreement made in Philadelphia was the payment of the maturing obligations of the company by William Ryle and the future management of the company by him, and the assignment to William Ryle, by John Ryle, of all

his interest in the company. The writing expresses nothing more than this by way of consideration. Nothing is said in the writing respecting the payment of the interest on the bonds.

What, therefore, were the terms or conditions of the agreement made in Philadelphia? What was the real interest and meaning of the parties? As appears from the testimony of Mr. Wright, called by the defendant, an intimate friend of William Ryle and a relative of both, William Ryle promised to pay "upon the understanding that he should have entire control of the company," and John Ryle, "his uncle, promising to pay everything over to him and to hand over all the securities and everything of that kind." There is not one word in this about an absolute sale. But to support Mr. Wright, the defendant placed Mr. Catholina Lambert on the stand. He spoke of a conversation with John Ryle, in October, 1876, respecting the payment of the accruing interest. He said it related to the payment of the interest on the bonds of the Passaic Water Company by William Ryle. He added:

"It appears from my recollection that the late William Ryle had agreed to furnish him money to pay the interest on the bonds then coming due, as the time was so near he was very anxious about it; Mr. William Ryle was in Philadelphia, and I think it was within two or three days prior to the time of the maturing of the interest, and the old gentleman was anxious about getting the money, and he told me at the time that he had agreed to give William Ryle his stock, and give him absolute control of the Passaic Water Company, if he would rescue it from its present condition—its then bad condition—and that if he did not get the money from William Ryle he did not know where it was coming from.

"Q. Did you say how much stock he was to give him?

"A. All his stock; he was to give him absolute control; he did not name the amount as I remember.

"Q. Did he say he would give him his stock then, as well as the control of the company?

"A. He said he would give him his stock."

In this there is not a word about selling the stock to him "absolutely and forever," but the witness says that John Ryle was to give his stock to William Ryle and to give him *absolute control* of the company.

The testimony of Mr. Lambert satisfies me that John Ryle detailed his understanding of the agreement to him at the time it was made, and that he detailed it substantially as Mr. Wright understood it. And I am satisfied, from the evidence of these two witnesses, that the writing does not express the true agreement of the parties. I am satisfied that the true understanding between the parties was that John Ryle was to give his stock to William Ryle, not for the purpose or with the intent of passing the title absolutely and forever, but for the purpose of securing to him the "entire control," as Mr. Wright expresses it, or the "absolute control," as Mr. Lambert says John Ryle himself expressed it.

It is certainly quite important to observe that William Ryle undertook no new or other obligations by the writing. He did not sign it. He certainly promised nothing beyond what he had already promised. Indeed, as before remarked, he rather aimed at diminishing any responsibility which he may have assumed, by the recital in the writing that the consideration was to himself "and those he might associate with him."

Therefore, to my mind, the writing does not express the true intent and meaning of the parties. Most clearly, the writing does not express the whole transaction, in that it makes no mention of the payment by William Ryle of the $15,000 in cash advanced by him on the 1st day of November previous, for the payment of the interest; in which particular the writing is not a complete and full expression of what took place. Thus, an imperfection or incompleteness in the writing is at once exhibited. The entire transaction is not and cannot be explained or understood without resort to parol evidence. The parties did not intend this writing should be used for any other purpose than *one;* that is, to convey to William Ryle the *legal* title. This was his own declaration on the subject. William Ryle so understood it. The court will be justified in so interpreting it.

The fact that the writing is not the complete agreement makes the introduction of parol testimony permissible. The agreement thus established presents the rights of the parties in a different aspect from what the writing alone presents them. This testi-

mony is not, under the circumstances of this case, in conflict with any rule of law or evidence respecting the establishment of agreements. This testimony shows, beyond a doubt, that if the court were to refuse its aid a very great fraud would be perpetrated. In my judgment, the case, as made, requires the court to interpose.

It will be observed that I have reached this conclusion without any reference to the testimony of John Ryle, the complainant. I have been fully convinced of the true nature of this transaction without resort to a single word from him. It seems, from the latest expression of the court of errors, that his testimony is admissible.

Nevertheless, I agree with the counsel of the defendant in saying that the testimony of one of the parties to a transaction, when the other one is dead and cannot speak, should be most carefully considered before it is allowed to have a controlling influence. Therefore, I sought to discover the real nature of this transaction before considering his testimony at all. The result is above expressed. I think the statements of the complainant are most abundantly corroborated by Mr. Wright and Mr. Lambert, and also by the statements of John C. Ryle, Reuben Ryle, and Peter Ryle, and by the letter prepared by William Ryle to be sent to Leisler & Somerhoff. I cannot devise any reasonable excuse for William Ryle dictating the letter he did to Leisler & Somerhoff, if he relied upon the writing for his title to the stock absolutely. And the same observation applies to the remarks made by him at the meeting of the stockholders in June, 1880.

I conclude that the complainant is entitled to relief. I think that the testimony shows that William Ryle took the stock, in the first place, to secure the repayment to himself of the $15,000 interest money advanced by him, and in the second place to enable him to reorganize the water company and build it up anew, which he was interested in doing, he being a creditor to a large amount of the company.

It is said that the testimony by which this result is reached is in conflict with the written agreement, and therefore contrary to

the rule which forbids the introduction of parol evidence to con-
tradict or vary a written agreement. As said above, I think to
give the written paper in this case the full force claimed for it,
would be giving countenance to a fraud. This would take the
case out of the rule contended for, and I think fairly within the
exceptions in *Naumberg* v. *Young, 15 Vr. 331.*

It being established that William Ryle held this stock for his
own protection, that being accomplished, what follows? I think
the fair inference is that he held the balance in trust for John
Ryle. I believe that such is the conclusion which equity will
deduce from the transaction. I can find nothing in the case to
lead the mind in any other direction, unless I consider the writing
wholly dissevered from every other material fact in the case. But
it will be seen that the trust was created long before the writing.
Therefore, we have the confidential relation of trustee and *cestui
que trust.* The rules that apply when the former deals with the
latter are so well understood that I need not recite them, except
to say that when the trustee claims that the absolute title to
property, which he once held in trust, has been transferred to
him by the *cestui que trust,* he must show affirmatively the ut-
most good faith and fair dealing. There has been no attempt to
show that good faith in this case. The defendant stands on the
writing, without a single effort to show that it was not only
voluntarily executed, but with a clear understanding of its legal
effect. I cannot understand how a trustee can stand within the
rule when he obtains such title by threats and pretences like
those used in this case.

On this branch of the case I also come to the conclusion I have
expressed wholly independent of the testimony of the complain-
ant. I might add, however, that on both branches of the case
the complainant's testimony lends great force to the conclusions
which I have reached.

I do not think I ought to advise a decree that the writing is
null and void absolutely, since possibly there may be important
rights which have been established thereunder in the transactions
and settlements of the company with third parties. The result
sought will be attained by a decree that the defendant holds all

of said stock in trust for the complainant, and that she shall make a complete transfer thereof to him, subject to any just claim that may, upon an accounting, appear still to be due the estate of William Ryle, deceased. The complainant is entitled to costs.

*Mr. J. S. Barkalow* and *Mr. B. Williamson,* for appellant.

*Mr. E. Stevenson* and *Mr. J. D. Bedle,* for respondent.

The opinion of the court was delivered by

DIXON, J.

Early in January, 1877, John Ryle, the complainant, was the owner of the stock of the Passaic Water Company, consisting of sixteen thousand eight hundred and fifty shares. About January 12th, 1877, he transferred to William Ryle six thousand seven hundred and six of these shares, and delivered to him a written order for four thousand shares besides, directed to Ammidown, Lane & Co., who held them in pledge as creditors of the firm of John Ryle & Sons. The character of this transaction is the matter to be settled by the court. The complainant contends that the stock was assigned in trust for himself, upon an understanding that William Ryle, being thus invested with the control of the corporation, would endeavor to improve its financial condition, which was then ruinous, so that it might pay its creditors, of whom William himself was one, and so that John might reap the benefit of the increase of value in its stock. The defendant, who is the sole legatee of William, insists that although the consideration of the transfer was the promise of William that he would try to enhance the value of the company's stock, yet the transfer was absolute for the use and benefit of William himself, and, as such, forms the main inducement for him to assume the management of the concern.

The defendant urges that the controversy must be decided upon the terms of a writing, dated January 31st, 1877, signed, sealed and acknowledged by the complainant February 1st, 1877, by which

it is declared that the latter had offered to transfer to William Ryle ten thousand seven hundred and six shares of the stock of the company, in consideration of William's assuming the management of the company's affairs, the complainant believing that thereby the residue of his stock would become more valuable than the whole then was, and that the complainant, for that consideration and $1 to him paid, did. thereby sell, assign, transfer and set over the said ten thousand seven hundred and six shares to said William, for his own proper use, benefit and behoof, absolutely and forever. But we think the inquiry is not to be thus concluded. For, if the complainant's claim be true, then at the time this instrument was executed, William was trustee for John and possessed of the trust property, and between parties thus situated the disposition of the trust property is not conclusively settled in courts of equity by the bargains which they make, however solemn the form wherein those bargains are attested. The trustee is practically incapable of purchasing the property from the *cestui que trust*, if the latter, under conditions of substantial equity, choses to avoid the attempted sale. *Perry on Trusts* § *195 ; Pom. Eq.* § *958 ; Condit v. Blackwell, 7 C. E. Gr. 481 ; Stewart v. Lehigh Valley R. R. Co., 9 Vr. 505.* If, at the time of signing this instrument, the parties had been in position to bind themselves by whatever arrangement they entered into, and the court were merely inquiring what their then arrangement was, this writing would no doubt, in the absence of fraud or mistake, be the sole evidence to be considered ; but since we are investigating a transaction which was complete twenty days before the existence of the writing, and which may render the stipulations of the writing of no effect, the writing, though evidence by reason of its retrospective force, is not indisputable proof.

The question, then, being an open one, to be decided on the probative strength of testimony, we have come to the conclusion that the complainant's claim is well founded. The writing just mentioned is, on its face, strongly indicative of the contrary, but, looked at in connection with the circumstances attending its execution, its force is, we think, overcome. The transfer of Jan-

uary 12th, 1877, was consequent upon a personal and amicable interview between John and William Ryle on the evening of January 10th, and there are shown no other dealings between them until January 31st. Then we find that William Ryle brought this writing to his cousin, John C. Ryle, and stated that from the position he was taking in the affairs of the water company he should have to appear before the public as the principal owner of its stock, and he was not going to stand in that position without being legally entitled to occupy it; thereupon he requested John C. to take the writing to their uncle John, the complainant, with a message that he wanted it signed in order to give him a legal claim to the stock; that it must be signed; and that if John would not sign it he would withdraw from the Passaic Water Company all his aid and countenance, and would also make such a representation to Leissler & Somerhoff, with whom the complainant was then negotiating for some business engagement, as would interfere with the pending negotiations. John C. delivered the writing, with this message, to the complainant, who at first was angry and declared to John C. that he would not sign it, but after a day or so signed it and returned it to the messenger. These circumstances render it highly probable that the writing is not an embodiment of the understanding arrived at by John and William on January 10th. If it had been, its preparation would hardly have been so long delayed; it would not have been prepared by William alone without consulting John; William would not have anticipated a refusal on the part of John to sign it, and have thought threats necessary to enforce its execution, and John would not at first have angrily refused his signature, and at last have put his name to it when the threats had exerted their full influence upon his mind. This writing does not express the real nature of the transaction of January 10th.

The substantial truth of the complainant's version of that transaction is, we think, made out by the following circumstances:

John was William's uncle. Both were Englishmen, and after the former had been in this country some years, and had established himself in business, he brought here the latter, then a boy,

and made him a member of his household. When William grew to man's estate he became prosperous, and in 1877 was a person of large wealth and widely recognized commercial ability. The complainant, on the contrary, was much embarrassed, and likely to lose all he had been struggling to secure. It would therefore not be strange that William should consent to assist his uncle to repair his shattered fortunes, without exacting from him, as the price of his aid, more than half of what he should try to save.

William's statement to John C. of the reasons that led him to require the signing of the writing of January 31st, gives strong color to the idea that under the arrangement theretofore made between John and William, the latter was to appear before the public as the principal owner of the stock without being actually entitled to it. Such was indeed the substantial tenor of his language; and if William was not the actual owner of the stock, then the only alternative is that John remained the real, though not the apparent owner.

This is further indicated by a letter which soon after January 31st, William dictated for John to sign and send to Ammidown, Lane & Co., in regard to the four thousand shares held by them, and for which William had John's order. In this letter the stock is spoken of as being still John's property, and its transfer to William and the consequent change in the management of the water company are mentioned as being conducive to John's financial responsibility, without any intimation that he was stripping himself of the ownership of so large a proportion of his assets.

So, also, in June, 1880, at a meeting of the stockholders of the water company, William, being somewhat excited and irritated at the absence of John, which occasioned inconvenience in the transaction of business, declared that it was outrageous that John should not attend, while he, William, was sacrificing his time and giving his energies to the advancement of the company, which was not at all for his interests, but solely for the interests of John, or (as another witness narrates it) in which he himself had not a penny's worth of interest, but which he was doing for John.

On July 5th, 1880, William wrote to John about the settlement of a mortgage for $100,000, which William, as one of the executors of his father, held upon some property of John. On July 10th, 1880, John responded:

"Dear Nephew—Yours of the 5th instant received, and its contents have given me great anxiety. I hardly know what proposition I can make. If I could obtain the real value of the ten thousand seven hundred and six shares of the capital stock of the Passaic Water Company you hold in trust for me, from any one, I could pay the mortgage off. What amount do you think I could obtain from you or any one else for them?" &c., &c.

To which William replied:

"Paterson, July 14th, 1880.

"Dear Uncle—Yours, dated 10th (postmarked 12th), is at hand. I hasten to correct an erroneous expression in the first portion of your letter; will reply to the second portion this evening. I do not, to my knowledge, hold a single share of the capital stock of the Passaic Water Company *in trust* for you or any other person."

John's letter seems to us the natural utterance of what he supposed to be an undisputed fact, while William's response, containing a bare denial, without any suggestion of surprise or desire for explanation, indicates that he was conscious that John's statement was not unfounded, but that he himself had determined to assume a position which he believed his evidence would enable him legally to maintain. It is true that notwithstanding this denial John took no steps to enforce his claim to the stock until the institution of this suit in 1883, but his financial relations with William account for his quiescence during William's life.

The matters thus far adduced are established by evidence outside of the complainant's own testimony, and they satisfy us of the substantial justice of his case. He, however, has been sworn, and his testimony on all points is competent. For although the defendant, who is both the executrix and the legatee of William Ryle, became possessed of the stock in controversy, as executrix, on his death in November, 1881, yet, early in 1883, she had it transferred to herself individually, and is now sued

personally, and not in a representative capacity.  *Hodge* v.
*Coriell, 15 Vr. 456 ; S. C., 17 Vr. 354.*

The complainant's testimony directly supports the allegations
of his bill, but inasmuch as there is reason to suspect that the
delay to sue after William's death was in part owing to a desire
to evade the statute, which would have prevented him from tes-
tifying to the transactions between himself and William in a suit
against the executrix, we prefer to rest our decree upon proofs
which would have been competent had the bill been more
promptly filed.

Having thus reached the conclusion that at the time the writ-
ing of January 31st was executed, William was trustee for John,
in possession and control of the trust property, we must decide
that that writing, obtained as it was by threats, and without
other consideration than the trustee's promise to do what he had
already assumed to do in performance of his trust, cannot be
permitted to relieve William of his fiduciary obligations.   John
is at liberty to rescind the absolute assignment on equitable
terms.

To this effect is the decree below.

But a majority of the court are of opinion that the decree
should more definitely indicate what terms are equitable, and
that the defendant, as sole legatee of William, and owner of all
his interest in the stock, should have secured to her whatever
would have been due to him as compensation for his care, skill
and responsibility in the matter.   The contract of January 31st
makes it plain that his services were not to be rendered gratui-
tously, or merely for the advantage he would gain as a creditor
by the improved condition of the company.   In view of the very
unusual character of the trust, of the success which has attended
the trustee's efforts, and the great profits which it appears will
accrue therefrom to the *cestui que trust*, the court decrees one-
third of the stock held by the defendant, a just allowance
therefor.

Let the decree below be reversed, and a decree be entered to
the effect that the defendant holds ten thousand seven hundred
and six shares of stock of the Passaic Water Company in trust

for the complainant, with the right of retaining one-third of the same for the services rendered by William Ryle, the trustee, in executing his trust.

*Decree unanimously reversed.*